# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **8:07CR386** |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | **REPORT AND** |
| ) | **RECOMMENDATION** |
| **SALVADOR CATALAN-CASIANO,** ) | |
| a/k/a **MARTIN MORALES,** ) | |
| ) | |
| **Defendant.** ) | |

This matter is before the court on the motion to suppress filed by defendant Salvador Catalan-Casiano (Catalan-Casiano) (Filing No. 26). Catalan-Casiano is charged in a Superseding Indictment as an illegal alien who entered the United States at a non-designated place (Count I) in violation of 8 U.S.C. § 1325(a); possession of false identification documents in violation of 18 U.S.C. § 1028(a)(5) (Counts II and III); and a criminal forfeiture of personal property used during the conspiracy pursuant to 18 U.S.C. § 1028(b)(5) (Count V). **See** Filing No. 13.

Catalan-Casiano seeks to suppress any evidence obtained as a result of a search of a package shipped via Federal Express, the search of 6824 Phelps Plaza, Apartment 134, Omaha, Nebraska on November 6, 2007, and subsequent statements made by Catalan-Casiano. A hearing was held on March 5, 2008. Catalan-Casiano was present for the hearing along with his appointed counsel, Julie B. Hansen, Assistant Federal Public Defender. The United States was represented by Assistant U.S. Attorney Frederick Franklin. The court heard the testimony of Nebraska State Patrol (NSP) Investigator Richard Lutter (Investigator Lutter) and Immigration and Customs Enforcement (ICE) Special Agent Brent Morral (Special Agent Morral). The court received into evidence an application and affidavit for a search warrant (Exhibit 1). There were no post-hearing briefs. A transcript (TR.) of the hearing was filed on March 13, 2008 (Filing No. 37), at which time the motion was deemed submitted.

## FINDINGS OF FACT

Investigator Lutter has been a narcotics investigator since July of 1994, and with the NSP since September of 1991 (TR. 3-4). On November 5, 2007, Investigator Lutter received information from security personnel at the Federal Express, located at 72nd and Q Streets in Omaha, Nebraska, about a package which was inconsistent with standard shipping (TR. 4, 6, 17). Federal Express stated the address on the package was fictitious (TR. 4). However, two individuals arrived at Federal Express on November 5, 2007, to pick up the package (TR. 7). Federal Express did not release the package because the individuals could not produce adequate identification (TR. 7). Instead Federal Express kept the package and contacted the police (TR. 7).

Investigator Lutter examined the package, noting the package was addressed to Martin Morales at 2235 S. HP Street, Apartment B (TR. 6). Investigator Lutter verified the address did not exist in Omaha, Nebraska (TR. 4, 7). Investigator Lutter saw the package came from Arizona, a "source area" for controlled substances (TR. 8). Additionally, the package was over-taped, that is it had extra tape even though the box was self-sealing (TR. 8). The manner of packaging was consistent with previous packages found to contain controlled substances (TR. 8). The shipping and receiving telephone numbers contained too many digits to be verified as legitimate numbers (TR. 9). Based on these observations, Investigator Lutter presented the package for a canine sniff on the possibility it contained a controlled substance (TR. 4, 9).

NSP Investigator Eberle, a trained canine handler, conducted the canine sniff with his canine, Rocky (TR. 10). A canine sniff took place at the Federal Express office on November 6, 2007 (TR. 10; Exhibit 1). Investigator Lutter watched the canine sniff (TR. 11). Investigator Eberle informed Investigator Lutter that Rocky, a certified police dog, gave a positive indication to the odor of narcotics on the package (TR. 10-11). Subsequently, Investigator Eberle applied for, and was granted a search warrant for the package (TR. 12-13; Exhibit 1). Investigator Lutter assisted Investigator Eberle in preparation of the search warrant application (TR. 12-13).

The search warrant application gives the following grounds for issuance of the warrant:

> On Monday, November 5, 2007, your affiant was notified by Federal Express security personnel that a package bearing tracking number 8634-9516-9220, shipped from Juan Escutiojo, 4862 Thomas Road, Pheoniz, [sic] Az.,85018, addressed to Martin Morales, 2235 S. HP Street, Apt. B, Omaha, Ne., 68107, was attempted to be picked up by an individual at the ticket counter who was not able to produce proper identification. Due to this circumstance the package was not released to that individual. Federal Express then checked the shipping address and noticed it to be fictitious. Based upon these circumstances, Federal Express security contacted your affiant.
>
> On Tuesday, November 6, 2007, your affiant arrived at Federal Express located at 7130 Q Street, in Omaha, Douglas County, Nebraska. Your affiant observed the Federal Express package bearing tracking number 8634-9516-9220, shipped from Juan Escutiojo, 4862 Thomas Road, Pheoniz, [sic] Az.,85018, addressed to Martin Morales, 2235 S. HP Street, apt. B, Omaha, Ne., 68107. Your affiant noted that the package was paid for in cash, $37.28, shipped via two day on October 31, 2007. Your affiant noted that the package was over taped and when reviewing the airbill, it was noted that both shipping and receiving phone numbers contained two [sic] many numbers to be correct.
>
> Based on the above indicators, your affiant deployed Narcotic Detector Dog Rocky on the package bearing tracking number 8634-9516-9220, shipped from Juan Escutiojo, 4862 Thomas Road, Pheoniz, [sic] Az.,85018, addressed to Martin Morales, 2235 S. HP Street, apt. B, Omaha, Ne., 68107. Rocky showed a positive indication to the presence of narcotic odors emitting from the package. Rocky has been deployed 249 times. Of the 249 times, Rocky has indicated positively to the presence of narcotic odors 222 times. Of the 222 indications, your affiant has located the physical presence of narcotics or has been explained the reason of the presence of narcotic odors on property. Rocky was last certified in July of 2007.

**See** Exhibit 1.

On November 6, 2007, after receipt of the search warrant, Investigator Lutter seized and opened the package and examined the contents (TR. 15). The package contained 500 white blank identification cards, with a holographic immigration/naturalization stamp imprinted on them (TR. 15-16). Investigator Lutter contacted the ICE office about the

identification cards (TR. 16).  The cards are considered I-551 green cards (TR. 35).  The officers wanted to make a controlled delivery of the package, but did not have the correct address (TR. 16).

The officers maintained custody of the package until approximately 2:00 p.m. when the Federal Express security office advised the officers that individuals were again attempting to pick up the package (TR. 16).  Investigator Lutter returned the package to Federal Express for release to the individuals who were waiting for it (TR. 17).  Federal Express released the package the individuals (TR. 17-19).  Investigator Lutter first saw Catalan-Casiano outside the facility during surveillance, when Catalan-Casiano was exiting with the package (TR. 18-19).  Catalan-Casiano, carrying the package, rode in the passenger side of a vehicle (TR. 20).  Separately, Investigators Lutter and Eberle followed the vehicle to 6824 Phelps Plaza, which took approximately three minutes (TR. 20-21).  Investigator Eberle followed the individuals to apartment 134 (TR. 21).

While maintaining surveillance, the investigators waited for NSP supervisors and ICE agents (TR. 22).  ICE Special Agent Morral arrived to assist in the investigation (TR. 34).  Special Agent Morral has been an ICE agent since December of 2003 (TR. 34).  Investigator Lutter, along with Investigator Eberle and Special Agent Morral, knocked on the front door at apartment 134, the person who answered the door was one of the two individuals who picked up the package at the Federal Express office (TR. 23).  Investigator Lutter presented his badge and identification card, and stated his name, that he was with law enforcement, and that no one was in any kind of trouble or under arrest (TR. 23).  Investigator Lutter asked if he could step into the apartment (TR. 23-24).  The individual, later identified as Obed Martinez-Lopez, said "yes" and stepped away from the door, opening it a little bit further (TR. 23-24).  Investigator Lutter then entered the apartment (TR. 24).  However, prior to entering the apartment, while speaking with Martinez-Lopez, Investigator Lutter was able to see the Federal Express package, and its contents, back and into the right side of the apartment (TR. 24, 29-30).  Investigator Lutter also saw a computer set up along a wall with a printer (TR. 24, 30).  The printer was not the type used for standard documents, but the type used for printing identification cards (TR. 24, 30).

Just after stepping into the apartment, Investigator Lutter advised the other officers the Federal Express package was present (TR. 25, 36). Investigator Lutter also asked Martinez-Lopez if other people were present in the apartment (TR. 25). Just then another individual, Catalan-Casiano, stepped out of the bedroom and Investigator Lutter asked him the same question and whether the officers could check the apartment for other occupants for officer safety reasons (TR. 25). Catalan-Casiano indicated there were no others present (TR. 25). The officers checked the apartment and found no others present (TR. 25). At that time, the officers determined a translator would be needed (TR. 26). Additionally, since the officers saw the Federal Express package and other evidence, they made arrangements to obtain a search warrant for the apartment (TR. 26). Investigator Lutter prepared an application for a search warrant, including his own affidavit (TR. 26). Investigator Lutter presented the application to a Douglas County Court Judge, who issued the search warrant (TR. 27-28).[1]

Prior to the arrival of an interpreter or advising Catalan-Casiano of the ***Miranda*** warning, Special Agent Morral and another agent interviewed Catalan-Casiano and Martinez-Lopez as to their immigration status (TR. 37-38, 41). Catalan-Casiano gave his correct biographical information, admitted he was in the country illegally and had entered the country without inspection (TR. 37, 40). During the interview, Catalan-Casiano was not yet placed under arrest, but he would not have been free to leave (TR. 40). Afterwards, another agent ***Mirandized*** Catalan-Casiano to discuss the identification cards (TR. 38). At that time, Catalan-Casiano requested an attorney and denied consent to search the premises (TR. 38). The officers learned from Martinez-Lopez that Catalan-Casiano lived in the apartment and Martinez-Lopez was only visiting (TR. 38, 41-42).

## CONCLUSIONS OF LAW

**A.    Federal Express Package**

The defendant argues the package was seized, without justification, prior to issuance of a search warrant. Specifically, the defendant contends the package was

---

[1] A copy of the signed search warrant for the apartment was not offered into evidence. An unsigned copy was presented, but not admitted into evidence.

5

seized, for purposes of the Fourth Amendment, to facilitate the dog sniff. Additionally, the defendant argues the search warrant lacked probable cause based on its failure to provide additional information about Rocky's credentials and performance record. Finally, the defendant argues that after the package was opened a second warrant was necessary to further detain the package because drugs, which the officers suspected to find, were not present. The government maintains reasonable suspicion endorsed the removal of the package from the stream of commerce to facilitate a dog sniff. Further, the government contends that once Rocky indicated the presence of the odor of narcotics, probable cause substantiates the search warrant and search of the package.

"Our federal Constitution mandates '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" **United States v. Va Lerie**, 424 F.3d 694, 700 (8th Cir. 2005) (en banc) (**citing** U.S. Const. amend. IV). Clearly, "[t]he Fourth Amendment protects against both unreasonable searches and unreasonable seizures." **Id.** These protections extend to items placed in the mails. **United States v. Johnson**, 171 F.3d 601, 603 (8th Cir. 1999) (**citing United States v. Van Leeuwen**, 397 U.S. 249, 251 (1970)).

### 1. Seizure

"Seizure occurs when a package is removed from its ordinary progress in the mail and is diverted for further investigation." **United States v. Smith**, 383 F.3d 700, 704 (8th Cir. 2004). Legal justification must exist if such diversion "'meaningfully interfere[s]' with an individual's possessory interests in the property." **United States v. Zacher**, 465 F.3d 336, 338 (8th Cir. 2006) (**quoting Va Lerie**, 424 F.3d at 701, 706; **see United States v. Jacobsen**, 466 U.S. 109, 113 (1984). Accordingly, "[a] law enforcement officer must have reasonable suspicion that a piece of mail, or a package shipped via a commercial carrier, contains contraband to lawfully seize it for investigative purposes." **United States v. Lakoskey**, 462 F.3d 965, 975-76 (8th Cir. 2006) (**quoting Smith**, 383 F.3d at 704). Reasonable suspicion that a package contains contraband exists if, under the totality of the circumstances, the suspicion has "a particularized and objective basis" greater than a mere "inchoate and unparticularized suspicion or hunch". **Johnson**, 171 F.3d at 603 (**quoting**

6

*Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Apparently innocuous conduct may support reasonable suspicion, if such conduct viewed under the circumstances by a trained officer is consistent with an attempt to conceal contraband or illegal activity. *Lakoskey*, 462 F.3d at 976.

The government concedes law enforcement seized the package when officers subjected it to the dog sniff. **See** *Lakoskey*, 462 F.3d at 976. However, under the circumstances of this case, it is unlikely a constitutional seizure occurred. **See** *United States v. Quoc Viet Hoang*, 486 F.3d 1156, 1162 (9th Cir. 2007) (no seizure occurred because ten minute pre-sniff detention did not interfere with next-day package delivery); *Zacher*, 465 F.3d at 338 (no seizure when dog sniff occurred on floor of FedEx office before deadline for delivery of package). The officers did not remove the package from its ordinary progress in commerce until after the dog sniff. The package could not be delivered by Federal Express due to the fictitious address and telephone numbers. Further, Federal Express decided not to release the package to the individuals who had arrived to pick up the package.

In any event, reasonable suspicion supported removal of the package from its ordinary progress for the brief detention prior to Rocky's indication on the package. The aggregate facts raising reasonable suspicion include: the fictitious receiving address; the drug source area shipping address; the over-taping; the illegitimate telephone numbers; and inadequate identification of individuals who arrived to retrieve the package. Investigator Lutter testified that these facts raised his suspicions and the manner of packaging was consistent with previous packages found to contain controlled substances (TR. 8). In addition, the package was shipped via two-day delivery and paid for with cash for $37.28 (Exhibit 1). Under the totality of the circumstances, the court finds reasonable suspicion supports any brief detention of the package for investigation pre-sniff. **See, e.g.**, *Lakoskey*, 462 F.3d at 976; *United States v. Gomez*, 312 F.3d 920, 922 (8th Cir. 2002) (noting cost of shipping method, $37.55, and over-taping contributed to reasonable suspicion).

### 2. Package Search Warrant

An affidavit for a search warrant must contain probable cause of four ingredients: time, crime, objects, and place. 2 Wayne R. LaFave, Search and Seizure, § 3.7(d) at 412 (4th ed. 2004). As the Supreme Court stated in **Illinois v. Gates**, 462 U.S. 213, 238 (1983): "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." **Id.** Thus, when viewing a search warrant, the court must look at the totality of the circumstances set forth in the affidavit. **See id.**; **United States v. Etheridge**, 165 F.3d 655, 656 (8th Cir. 1999). "The duty of the judge issuing a search warrant is to make a 'practical, common-sense decision' whether, considering all the circumstances, a reasonable person could have reason to suspect that evidence would be discovered. . . . Probable cause is a fair probability that contraband evidence of a crime will be found in the location to be searched." **United States v. LaMorie**, 100 F.3d 547, 552 (8th Cir. 1996). **See Gates**, 462 U.S. at 238. The Eighth Circuit has explained the issuing magistrate's obligation as follows:

> The task of the issuing magistrate is to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed." When the magistrate relied solely on the affidavit presented to him, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." Affidavits must be read in "a common-sense and realistic fashion." "Deference is accorded an issuing magistrate's probable cause determination . . ."

**United States v. Gladney**, 48 F.3d 309, 312 (8th Cir. 1995) (internal citations omitted); **see also United States v. Spinosa**, 982 F.2d 620 (1st Cir. 1992) ("The affidavit must be 'viewed in its entirety,' and 'must be given a common-sense and realistic, rather than a hyper technical interpretation.'").

The court finds there is ample evidence supporting the probable cause finding in the search warrant. Assuming the "dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." **United States v. Donnelly**, 475 F.3d 946, 955 (8th Cir. 2007). Although the defendant challenges Rocky's credentials, the affidavit contains information that Rocky is a certified and experienced drug detection dog. "To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs. An affidavit need not give a detailed account of the dog's track record or education." **See *United States v. Sundby***, 186 F.3d 873, 876 (8th Cir. 1999). The affidavit in this case goes beyond what is required by describing Rocky's experience. Accordingly, on its face, the affidavit set forth enough facts to support a reasonable belief that the package probably contained drugs. Under these circumstances, the court finds reliance on the search warrant was reasonable under the *Leon* good faith exception. **United States v. Leon**, 468 U.S. 897 (1984).

Although a search of the package did not reveal illegal narcotics, no additional search warrant was required to further detain the package. Once the officers searched the contents and determined the package contained contraband, they had legal justification for the brief detention between the search and release of the package to the defendant.

**B.     Apartment 134**

The defendant argues officers illegally entered and searched Apartment 134, without a warrant. First, the defendant contends the initial entry was unlawful and the officers conducted a search, without consent, prior to seeking a search warrant. Second, the defendant asserts the government has failed to show a search warrant was ever issued.

"In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." ***Payton v. New York***, 445 U.S. 573, 589-90 (1980) (citations omitted); **see *also United States v. Vance***, 53 F.3d 220, 221 (8th Cir. 1995). "It is a well-established constitutional principle that law enforcement officers may not enter a person's home without a warrant unless the

entry is justified by exigent circumstances or the consent of the occupant." ***United States v. Conner***, 127 F.3d 663, 666 (8th Cir. 1997) (**citing *Steagald v. United States***, 451 U.S. 204, 211 (1981)). "[T]he 'touchstone of the Fourth Amendment is reasonableness.' Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." ***Ohio v. Robinette***, 519 U.S. 33, 39 (1996) (**citing *Florida v. Jimeno***, 500 U.S. 248, 250 (1991)).

Here, officers knocked on the door of the apartment and it was answered by Martinez-Lopez. After, Investigator Lutter introduced himself and asked for permission to enter, Martinez-Lopez gave verbal consent to enter. Additionally, Martinez-Lopez provided non-verbal consent to enter by stepping away from the door, opening it a little bit further (TR. 23-24). Investigator Lutter acted reasonably under the circumstances by relying on Martinez-Lopez's consent to enter. **See *United States v. Adams***, 346 F.3d 1165, 1170-71 (8th Cir. 2003) (**quoting *United States v. Matlock***, 415 U.S. 164, 171 (1974)). Accordingly, the court finds no violation of the defendant's Fourth Amendment at the time of law enforcement's entry into the apartment.

It is uncontested that Investigator Lutter made certain critical plain view observations of items of an evidentiary nature from the doorway of the apartment. "[W]hen the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment." 1 Wayne R. LaFave, ***Search & Seizure***, § 2.3(f) at 600-03 (4th ed. 2004). Investigator Lutter's observations were properly included in his application to search the apartment.

However, whether he made the observations prior to entry or during a protective sweep is legally insignificant. "Except in certain carefully defined classes of cases a search of private property without proper consent is unreasonable unless it has been authorized by a search warrant." ***Camara v. Mun. Ct.***, 387 U.S. 523, 528-29 (1967). In ***Maryland v. Buie***, the Supreme Court determined a protective sweep was a carefully defined exception to the warrant or consent requirement. The Supreme Court stated the grounds needed to justify a protective sweep: "there must be articulable facts, which taken together with the

rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 334 (1990).  The protective sweep is "not a full search of the premises, but may extend to a cursory inspection of those spaces where a person may be found." *Id.* at 335.  Under the circumstances, the court finds no illegal search occurred prior to the time Investigator Lutter sought issuance of a search warrant.

Although the signed search warrant was not presented as evidence during the hearing, the court credits Investigator Lutter's testimony that the warrant was issued based upon his affidavit regarding the previous package search warrant and the plain view observations made when the officers entered the apartment.  The defendant does not challenge the sufficiently of the affidavit in support of the search warrant other than its inclusion of the evidence viewed either from the doorway or during the protective sweep.  Accordingly, the court need not otherwise evaluate the sufficiency of the affidavit.

C.   **Statements**

The defendant argues the statements he made were the result of custodial interrogation without benefit of a *Miranda* advisement.  The Self-Incrimination Clause provides:  "No person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  "[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." *United States v. Patane*, 542 U.S. 630, 637 (2004).  The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278 (1936).  The court must look to the totality of circumstances in determining whether or not the statements were voluntary. *Mincey v. Arizona*, 437 U.S. 385 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

One of the principal factors is whether or not the defendant was in custody at the time of the statements.  "A consensual encounter does not amount to a custodial situation requiring the administration of *Miranda* warnings." *United States v. Woods*, 213 F.3d 1021, 1023 (8th Cir. 2000).  A *Miranda* warning must precede any custodial interrogation. A custodial interrogation involves questioning initiated by law enforcement officers after a

person has been taken into custody or otherwise deprived of his freedom of action in any significant way." ***United States v. Chamberlain***, 163 F.3d 499, 502 (8th Cir. 1999) (**citing *Miranda v. Arizona***, 384 U.S. 436 (1966)). "Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom in any significant way." ***United States v. Griffin***, 922 F.2d 1343, 1347 (8th Cir. 1990). "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." ***Thatsaphone v. Weber***, 137 F.3d 1041, 1044 (8th Cir. 1998) (**citing *Stansbury v. California***, 511 U.S. 318, 322 (1994)). The definition of questioning includes, "either express questioning or . . . any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the [defendant]." ***United States v. Koontz***, 143 F.3d 408, 411 (8th Cir. 1998) (**citing *Rhode Island v. Innis***, 446 U.S. 291, 300-01 (1980)). Failure to advise an in-custodial defendant of such rights will render the statements inadmissible if made by such a defendant as a result of police interrogation.

The defendant declined to give a statement in this case after he was advised of the ***Miranda*** warning. The statements the defendant seeks to suppress are those related to his identity and illegal presence inside the United States. However, interrogation, for ***Miranda*** purposes, "does not generally include 'routine processing-type questions' such as the name and address of a suspect." ***United States v. Lockett***, 393 F.3d 834, 837 (8th Cir. 2005). On this basis, the court recommends denial of the defendant's motion to suppress his statements.

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**
Catalan-Casiano's motion to suppress (Filing No. 26) be denied.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a

copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 21st day of April, 2008.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge